

# NUMBER 13-23-00190-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JIMMY COUNG DUC TRAN,                                          **Appellant,**

**v.**

THE STATE OF TEXAS,                                              **Appellee.**

## ON APPEAL FROM THE 186TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Peña and Cron[1]**
**Memorandum Opinion by Chief Justice Tijerina**

A jury convicted appellant Jimmy Coung Duc Tran of capital murder, and the trial

court sentenced him to life imprisonment without the possibility of parole. *See* TEX. PENAL

---

[1] The Honorable Nora L. Longoria, former Justice of this Court, did not participate in this opinion because her term of office expired on December 31, 2024. In accordance with the appellate rules, she was replaced on panel by Justice Jenny Cron. *See* TEX. R. APP. P. 41.1(a).

CODE ANN. § 19.03. By nine issues (and several sub-issues), Tran argues: (1) the trial court's admission of his cell phone records deprived him of his right to be free from unreasonable searches; (2) his custodial statement should have been suppressed based on an invalid waiver of *Miranda*; (3) the trial judge should have recused himself because he was partial and biased; (4) the trial court abused its discretion by denying Tran's motion for continuance because Tran was unable to cross-examine Detective Mark Duke and conduct an independent investigation; (5) the evidence is insufficient to convict him of capital murder because there was no evidence to refute his affirmative defense (defense of property) beyond a reasonable doubt; (6) the trial could should not have permitted Detective Duke to testify as an expert because he lacked expertise, and Tran was improperly prevented from conducting voir dire to challenge the basis of Detective Duke's testimony; (7) the trial court improperly prevented Tran from impeaching an eyewitness as to bias in favor of the State; (8) the trial court failed to include a jury instruction on the voluntariness of his custodial interrogation; and (9) the State engaged in repeated improper argument throughout the course of trial. We affirm.

## I.     BACKGROUND[2]

The State indicted Tran with capital murder for the death of Andres Salinas. *See id.* The indictment alleged that Tran intentionally caused Salinas's death by shooting him

---

[2] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

with a firearm while in the course of committing or attempting to commit the offense of robbery. *See id.* The following facts were produced at trial.

Sebastian Espinar testified that he was a codefendant in this case, and he pleaded guilty to murder in exchange for a twenty-five-year sentence. He testified that on August 12, 2019, he started his day by taking Xanax because he "likes getting high. That was [his] thing."[3] Because he was "extremely intoxicated" on Xanax and marijuana, he contacted Tran and asked Tran to drive Espinar's car to engage in a drug deal. According to Espinar, Salinas previously sold him "fake pills that had dangerous things in them," so he did not want Salinas to think it was okay to hoodwink him. For this reason, Espinar sought revenge by robbing Salinas, and he shared this plan with Tran. Espinar stated that Tran "supported" him, agreed to drive him, and brought an AR rifle, a Smith & Wesson 9mm, and cash for the encounter with Salinas. Espinar testified that he "instructed [Tran] to leave the car in neutral so that when [he] was handed the pills, [Tran] could shift . . . into drive and just leave."

Tran drove Espinar in Espinar's car to Wingstop, where Salinas was employed. They parked behind the Wingstop in an alley and waited for Salinas. Their plan was to display Tran's "money openly" so that Salinas "would just hand over the pills without any consequence." Tran's rifle was beside his leg on the driver side while the pistol was under Espinar's right leg on the passenger side. The money was stacked on Espinar's lap.

---

[3] Espinar testified that Xanax "leaves holes in [his] memory," impairs him physically, makes it difficult for him to use his hands and legs, causes his balance to be off, and makes him "really sleepy." He takes about three to four pills a day so that he consistently feels these effects throughout the day.

Espinar reiterated: "My plan originally was for . . . Salinas to see the money and feel comfortable handing me the pills, and then for [Tran] to shift into drive and drive away."

When Salinas approached the vehicle, Salinas gave Espinar the pill bottle. Espinar glanced at Tran who "seemed to have forgotten what we discussed," so Espinar displayed the pistol, and, in an effort to stall, Espinar instructed Salinas to go back inside to work. Salinas appeared to be confused, reached into the car, grabbed the money on Espinar's lap, and started running. Tran then yelled, "Oh, fu[**], my money!"

Espinar clarified that Salinas did not have a knife, did not display a weapon, did not hit him, and did not use any force against him. Espinar explained that he was scared, so when Tran told him to exit the vehicle and shoot, he did. Espinar clarified that Tran shot the first round and that Espinar "shot multiple rounds into the air, way above . . . Salinas." Espinar then entered the vehicle, sat down, and witnessed Tran "aiming the gun and shooting two more shots before [Tran] entered the vehicle and drove away." According to Espinar, Tran had "his left shoulder leaning against the area where the door handle is, and he's leaning into his gun and looking into the scope" while he was hunched over. Tran had "one foot still in the car" with a very "focused face." Espinar stated that Tran shot for about three to five seconds more, reentered the car, and sped off. As Tran drove away, Espinar claimed that he looked into the rearview mirror and observed Salinas still running away, so he believed that Salinas was not hurt.

After the shooting, Espinar claimed that they drove off into a neighborhood, but he had no recollection of the events that transpired because he chewed two to three Xanax

4

pills he had just stolen from Salinas. After he woke up, the sun was down, and he and Tran were somewhere that looked to be a trailer park. According to Espinar, Tran was attempting to get rid of the weapons. The two headed back to Espinar's apartment where Espinar took more Xanax, and Tran stashed the two guns. At that point, Tran showed him a news article announcing Salinas's death.

The next day, Tran asked Espinar for his money, so Espinar took out a loan for $800 and repaid Tran. Tran requested pictures of the guns so that he could "get rid of them," and Espinar sent him the photos. Thereafter, Tran and Espinar ceased communication.

Jay Dolan testified that he was homeless and was "hanging out" in the alley when he saw Salinas walk up to the passenger side of Espinar's car. Dolan stated: "I seen [sic] the guy from Wingstop running back towards his job, and then gunshots—boom, boom." According to Dolan, he was only fifteen yards away from this encounter. After the shooting, "[t]he driver jumped in the car and sped away."

Dolan stated there did not appear to be any prior disturbance. Dolan remembers the driver (Tran) was short, stocky, dark with a flat-top hairstyle while the passenger (Espinar) was tall and thin. Dolan clarified that both Espinar and Tran were shooting at Salinas. Dolan witnessed Tran holding a rifle that "had a thick part where the bullet c[a]me out of the muzzle . . . and a short stock." Espinar held a gray handgun.

The medical examiner testified that Tran died from a single gunshot wound to the back. Because there was "so much excess" force, Salinas's wounds were consistent with the use of a high velocity rifle.

Following other testimony from other witnesses, the jury convicted Tran and sentenced him as stated above. This appeal followed.

## II.     LEGAL SUFFICIENCY[4]

By his fifth issue, Tran argues that the evidence is legally insufficient to support the jury's rejection of his defense of property affirmative defense.

### A.     Standard of Review

In evaluating the legal sufficiency of the evidence, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "Viewing the evidence 'in the light most favorable to the verdict' under a legal-sufficiency standard means that the reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). The jury can choose to believe all, some or none of the testimony presented by the parties. *Chambers v. State*, 805

---

[4] We first address issues that would afford a party greater relief before reaching issues affording lesser relief. *Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010).

S.W.3d 459, 461 (Tex. Crim. App. 1991). An appellate court may not re-evaluate the weight and the credibility of the evidence or substitute its judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Circumstantial evidence is as probative as direct evidence, and it can be sufficient alone in establishing guilt. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

**B.    Applicable Law**

Defense of property is a justification defense. *See* TEX. PENAL CODE ANN. § 9.41(b). Under § 9.41(b), a person unlawfully dispossessed of tangible, movable property by another is justified in using force against the other when the actor reasonably believes the force is immediately necessary to recover the property if the actor uses the force immediately or in fresh pursuit after the dispossession and the actor reasonably believes the other had no claim of right. *Id.*

Section 9.42 provides that a person is justified in using deadly force to protect property if he would be justified in using force against the other under § 9.41 and when and to the degree he reasonably believes the deadly force is immediately necessary: (1) to prevent the other's imminent commission of robbery, aggravated robbery, or theft during the nighttime or (2) to prevent the other who is fleeing immediately after committing

7

robbery, aggravated robbery, or theft during the nighttime from escaping with the property; and (3) he reasonably believes that the property cannot be recovered by any other means, or the use of force other than deadly force to protect or recover the property would expose the actor or another to a substantial risk of death or serious bodily injury. *Id.* § 9.42. The Penal Code defines "reasonable belief" as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

A defendant bears the initial burden of production regarding a defensive theory. *See Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). This requires the defendant to produce some evidence that supports the particular defense. *Id.* Once the defendant meets this burden by producing some evidence, the State then bears the burden of persuasion to disprove the raised defense. *Id.*; *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 2001). The burden of persuasion is not one that requires the production of evidence, so the State is not required to affirmatively produce evidence refuting the defensive claim. *Saxton*, 804 S.W.2d at 913. Instead, the State is required only to prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913. When the defendant is found guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

## C.     Analysis

Here, Espinar testified that he and Tran had organized a plan to rob Salinas, and Tran gathered two firearms in preparation of the drug transaction. After Salinas realized that Espinar would not pay him for the Xanax, he reached into the vehicle and grabbed

8

Tran's money. Tran yelled, "Oh, fu[**], my money!" stepped out of the vehicle, instructed Espinar to shoot, and the two began shooting at Salinas. Espinar stated that after he fired shots "in the air," he entered the vehicle while Tran stayed outside and fired more shots. Espinar observed Tran leaning his shoulder against the car door, pointing his rifle at Salinas, looking into the rifle's scope, and firing shots at Salinas with a "focused face." Thereafter, Tran and Espinar fled the scene without Tran's wad of cash. *See Clayton*, 235 S.W.3d at 780 (noting that a "factfinder may draw an inference of guilt from the circumstance of flight"); *see also Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (referencing flight from scene as evidence jury could consider in rejecting self-defense claim). Further, Espinar's version of events is consistent with the testimony of Dolan, who was a bystander and not a party to the drug transaction. Finally, the medical examiner testified that Salinas only had one gunshot wound—from a high velocity rifle—which was fatal and entered through his back.

Viewing these facts in the light most favorable to the verdict, the jury could have rejected Tran's protection-of-property defense for several reasons. Here, Tran and Espinar planned to rob Salinas; thus, Tran could not have reasonably believed that deadly force was immediately necessary to prevent the commission of robbery. *See* TEX. PENAL CODE ANN. 9.42(2)(a). Furthermore, Salinas did not display a weapon, did not use deadly force, did not harm Espinar or Tran, was running away from Tran and Espinar, and was shot in the back. *See id.* § 9.41(b)(2). Lastly, Tran stepped out of his vehicle, instructed Espinar to shoot, and fired shots in Salinas's direction. Therefore, Tran could not have

9

reasonably believed that deadly force was necessary to protect himself from a substantial risk of death. *See id.* § 9.42(3)(B); *Sparks v. State*, 177 S.W.3d 127, 132–33 (Tex. App.— Houston [1st Dist.] 2005, no pet.) ("The trial court did not err, therefore, by denying the defense-of-property instruction concerning Lauren, who, by appellant's own testimony was assisting him and not attacking or robbing him when appellant acted to defend his property). Finally, even if Tran could show the elements of § 9.41, the evidence also established that the incident occurred during daytime—not nighttime, as required for the use of deadly force in the protection of property. *See id.* § 9.42(2)(A)–(B). Having reviewed all of the evidence in the light most favorable to the State, we conclude the jury rationally could have found each element of the offense was proven beyond a reasonable doubt, and rationally could have rejected Tran's defense of property claim. *See id.* We overrule his fifth issue.

### III. MOTION TO SUPPRESS

By his first issue, Tran argues that the trial court should have granted his motion to suppress, and the trial court's admission of his cell phone records deprived Tran of his right to be free from unreasonable searches.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We afford almost total deference to the trial court's findings of historical facts as well as mixed questions of law and fact that

turn on an evaluation of credibility and demeanor. *Abney v. State*, 394 S.W.3d 542, 547 (Tex. Crim. App. 2013). "The trial [court] is the sole judge of witness credibility and the weight to be given to witness testimony." *Chumacero v. State*, 676 S.W.3d 878, 891 (Tex. App.—Corpus Christi–Edinburg 2023, pet. ref'd); *Ex parte Moore*, 395 S.W.3d 152, 158 (Tex. Crim. App. 2013). We review de novo the trial court's application of the law to the facts. *Valtierra*, 310 S.W.3d at 447.

We view the evidence in the light most favorable to the trial court's ruling by considering "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). The trial court's ruling will be upheld if it is supported by the record and correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

## B.   Search Warrant

By a sub-issue to his first issue, Tran argues the search warrant lacked probable cause because "there are no facts alleged in the affidavit that tie the offense to the use of a cellular phone, as noted by the [t]rial [c]ourt and acquiesced to by the State."

### 1.   Applicable Law

A magistrate may not issue a search warrant unless it is based on probable cause as determined from the four corners of the affidavit. *State v. Elrod*, 538 S.W.3d 551, 556 (Tex. Crim. App. 2017); *Gonzales v. State*, 481 S.W.3d 300, 306 (Tex. App.—San Antonio 2015, no pet.). "The four corners of an affidavit supporting a search warrant are sufficient

11

if, from the totality of circumstances reflected in the affidavit, the magistrate was provided with a substantial basis for concluding that probable cause existed." *Gonzales*, 481 S.W.3d at 306. "Probable cause for a search warrant exists if, under the totality of circumstances presented to the magistrate in an affidavit, there is at least a 'fair probability' or 'substantial chance' that evidence of a crime will be found." *Id.* "[I]n interpreting affidavits for search warrants courts must do so in a common sense and realistic manner." *Elrod*, 538 S.W.3d at 556 (internal quotation omitted). "A magistrate, in assessing probable cause, may draw inferences from the facts." *Id.* "Therefore, although the magistrate's determination of probable cause must be based on the facts contained within the four corners of the affidavit, the magistrate may use logic and common sense to make inferences based on those facts." *Id.*

We give great deference to a magistrate's decision to issue a warrant. *Id.* at 556–57; *Gonzales*, 481 S.W.3d at 306. "[W]here [the underlying] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *Gonzales*, 481 S.W.3d at 306.

### 2. Relevant Facts

On August 26, 2019, Detective Duke from the San Antonio Police Department (SAPD) applied for and received a search warrant for Tran's cell phone. On May 12, 2021, Detective Duke applied for a second search warrant for Tran's cell phone and received a

12

subsequent search warrant. The subsequent warrant was based on additional information, and, according to the State, a subsequent search was done. Detective Duke included the following information in his probable cause affidavit:

- Salinas was found dead with a cell phone in his possession;

- Espinar admitted to using a cell phone at the time of the murder;

- Tran was in possession of a cell phone at the time of his arrest that is believed to be the same device he was using and on the night of the murder;

- Espinar informed police that there was communication between himself and Tran before and after the murder;

- contents in Tran's phone would corroborate Espinar's confession that he and Tran were the perpetrators;

- Espinar informed police that Tran had been looking to secrete the murder weapon;

- a search of Tran's phone will reveal information, pictures, and data of Tran's attempts to sell the murder weapon;

- information of Tran's phone would reveal his participation in the murder and potentially identify others who may be potential witnesses to Tran's attempts to secrete the weapon;

- Espinar admitted he had communication with Tran in the days following the murder and hours before in the form of text messages, social media communication, and voice chats in Tran's phone.

On March 23, 2023, Tran filed a motion to suppress, arguing the language in Detective Duke's original affidavit (August 26, 2019) is unrelated to Tran's cell phone and is thus insufficient to establish probable cause. However, at the motion to suppress hearing, both parties relied on the subsequent May 2021 warrant only, which the trial

13

court referred to as the "curative warrant." The trial court did not review the original warrant, and the parties did not provide any argument regarding the original warrant. Instead, Tran argued that the curative warrant lacked language that affirmatively placed Tran with a cell phone at the scene pursuant to *Baldwin v. State. See* 664 S.W.3d 122, 132 (Tex. Crim. App. 2022). Based on the probable cause affidavit attached to the application for the curative warrant and after reviewing the facts in *Baldwin*, the trial court found that Detective Duke gave particularized facts to establish probable cause and a nexus between Tran's cell phone and the crime, and it denied Tran's motion to suppress. Incriminating information from Tran's cell phone was admitted into evidence, including a GPS reading that put Tran at the location of the murder at the time of the shooting, numerous incriminating text messages to and from Tran regarding his involvement in the shooting, and numerous text messages to and from Tran regarding selling and ridding himself of the firearms.[5]

### 3. Analysis

On appeal, Tran argues that the original warrant did not establish a nexus between the offense and the place to be searched. However, at the motion to suppress hearing, at dispute was the validity of the curative warrant and the cell phone evidence obtained pursuant to that warrant. That is, Tran did not address or raise any arguments related to the original warrant. *See* TEX. R. APP. P. 33.1. Furthermore, the trial court only reviewed

---

[5] Some of these messages include Tran allegedly stating the following: "I lost a rack today"; "The [explicative] died for that shit"; "Dog, I got in a crazy shooting earlier. I need to lay low. Somewhere I can stay at your spot"; and "Babe, I made the news," among others.

14

the curative warrant, and Tran does not argue that the trial court erred in this regard. *See* TEX. R. APP. P. 38.1(i). Accordingly, we only address the curative warrant in our analysis. *See Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014) ("[T]he point of error on appeal must comport with the objection made at trial.").

At the suppression hearing, Tran argued the curative warrant was based on boilerplate language, which he argues is insufficient under *Baldwin*. *See id.* It is undisputed that the subsequent probable cause affidavit contained general boilerplate language. However, "the use of boilerplate language in affidavits for warrants to search mobile phones" is consistent with the code of criminal procedure "so long as the generic language is coupled with 'other facts.'" *Id.* at 134. In this case, the probable cause affidavit contained specific facts connecting Tran's cell phone to the murder. Specifically, in his affidavit, Detective Duke stated that Espinar informed law enforcement that he communicated with Tran before and after the murder; that these communications would corroborate Espinar's confession that he and Tran were the perpetrators; that Espinar told law enforcement Tran was trying to "get rid" of the weapon by selling it and Tran's phone would reveal pictures and communications of his attempts; that Espinar admitted to communicating with Tran days following the murder and the hours just before; and that such data is in the form of text messages, social media communication, and voice chat, which can be found on Tran's phone.

We conclude the aforementioned "particularized facts demonstrate[] a fair probability that evidence relating to the offense would be located in the mobile phone." *Id.*

15

at 132. In other words, these facts tie Tran's cell phone to the offense and specifically explain how Tran's phone was used before and after the offense to communicate with Espinar, including trying to sell the weapons used to commit the murder. *See id.* Therefore, we conclude the affidavit sets forth details in sufficient facts to establish probable cause in accordance with the standards in *Baldwin.* We overrule Tran's first sub-issue.[6]

## C.    *Miranda*

By his second sub-issue, Tran argues that he did not voluntarily waive his rights when he was interrogated by Detective Duke because Detective Duke did not "elicit a waiver from Tran before launching into his first question" and used "deceptive statements during the interrogation."

### 1.    Applicable Law

Under *Miranda*, prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. *See Miranda v.*

---

[6] For the first time on appeal, Tran argues that even if the curative warrant was sufficient to establish probable cause, the evidence must be suppressed as fruit of the poisonous tree because police never "re-extracted the data from the phone based on a second search warrant." However, Tran did not raise this argument in the trial court and thereby waived this claim for appellate review. *See Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015) (finding that appellant did not preserve his constitutional Fourth Amendment arguments because in the trial court appellant limited his motion to suppress and argument in support of his motion to statutory violation allegations and did not raise constitutional violations); *see also Moser v. State*, No. 04-13-00826-CR, 2016 WL 5399645, at *5 (Tex. App.—San Antonio Sept. 28, 2016, pet. ref'd) (mem. op., not designated for publication) ("[I]n applying *Douds* to the facts of this case, we are constrained to hold that Moser did not preserve his first point of error for appellate review."). Notwithstanding, the trial court confirmed that the State was relying on evidence procured based on the subsequent warrant, and the trial court clarified that its ruling was based on the subsequent warrant.

*Arizona*, 384 U.S. 463, 444 (1966)*; see also Rodriguez v. State*, No. 13-19-00498-CR, 2020 WL 6072622, at *3 (Tex. App.—Corpus Christi–Edinburg Sept. 24, 2020, no pet.) (mem. op., not designated for publication)*.* The code of criminal procedure further establishes procedural safeguards against self-incrimination. *Joseph v. State*, 309 S.W.3d 20, 23 (Tex. Crim. App. 2010) (citing TEX. CODE CRIM. PROC. ANN. art. 38.22). "Before an oral recorded statement may be admitted into evidence, the State must show 'prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning.'" *Leza v. State*, 351 S.W.3d 344, 351 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3). We use the totality of the circumstances to determine whether appellant waived his rights knowingly, intelligently, and voluntarily. *Joseph*, 309 S.W.3d at 25.

The State has the burden to prove a valid waiver of *Miranda* rights by a preponderance of the evidence. *Leza*, 351 S.W.3d at 349. Two steps are required for a valid waiver: (1) the waiver must be voluntary, meaning that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) the waiver must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.*

### 2. Relevant Facts

The trial court held a hearing where Tran's custodial interrogation was admitted into evidence. In the video, Detective Duke first transitioned Tran's handcuffs from the

back to the front. He tells Tran several things before the interrogation: he knows there are two sides to every story; there are missing details that need to be brought out; cases are never clear-cut, there may be some reasons why things went down the way they did; he spoke to Espinar; he has video of the incident; Tran would find things interesting; and Tran would be provided with the opportunity to explain why things happened the way they did. Tran then requested some water, and Detective Duke complied.

Detective Duke stated that before Tran is asked any questions, he must advise Tran of his rights and to warn him of the consequences of waiving his rights. Detective Duke read Tran the required *Miranda* warnings and informed Tran that he had the right to terminate the interview at any time. Detective Duke asked Tran if he understood, and Tran shook his head affirmatively, and faintly stated, "Yeah." Detective Duke inquired whether Tran was feeling nervous. Tran responded, "Not at all" and added that his body was adjusting to the "nasty food" he is being served in jail. Tran then stated, "You may continue." Tran then denied knowing Espinar and denied ever communicating with him.

The trial court denied the motion to suppress and made the following findings and conclusions: based on the totality of the circumstances, it could infer that Tran understood his *Miranda* warnings and chose to waive them based on his words and actions; the answers to the questions were a free and deliberate choice, were not the result of intimidation, coercion or deception, and were out of his free will; Tran showed full awareness of his rights and the consequences of those rights; Tran's words, "You can continue" and his continued answers to the questions posed by Detective Duke showed

18

a knowing and voluntary waiver of those rights; Tran continued the interrogation and did not terminate the interview; Tran did not show he was acting under any level of coercion; and Tran displayed the requisite level of comprehension. *See Alford v. State*, 358 S.W.3d 647, 652 n.6 (Tex. Crim. App. 2012) (observing that Article 38.22 findings need not be made with "minute specificity" but must be sufficiently detailed to provide a basis on which to review the trial court's application of law to facts). The trial court thereafter redacted several portions of the interrogation based on relevancy, and it was admitted into evidence.

### 3. Analysis

Before interrogating Tran, Detective Duke recited the *Miranda* rights by reading off a statement verbatim. *See Miranda*, 384 U.S. at 444, TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2. When Detective Duke asked if Tran understood his rights, Tran affirmatively indicated he understood and whispered, "Yeah." After confirming that he did not feel ill, Tran initiated the interrogation by asking Detective Duke to proceed with the interview: "You may continue." *See Umana v. State*, 447 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("The recording of the oral statement shows Varela read appellant his rights and asked, 'Do you understand all your rights?' Appellant nodded his head up and down and stated, 'Uh-huh.' Thus[,] the record shows the warnings were given and appellant affirmatively indicated that he understood those warnings."); *see also Crawford v. State*, 648 S.W.3d 461, 464 (Tex. App.—San Antonio 2021, no pet.) ("When Crawford reinitiated the conversation, Crawford voluntarily waived any right. . . . The

19

statements provided by Crawford after these circumstances were not subject to suppression under the Fifth Amendment, and the trial court did not abuse its discretion by denying Crawford's motion to suppress."). The video demonstrates that immediately after being read his *Miranda* rights, Tran willingly participated in the interview, did not request an attorney at any time, and did not terminate the interview at any time. *See Hernandez v. State*, 387 S.W.3d 881, 885–86 (Tex. App.—San Antonio 2012, no pet.) ("At no time did Hernandez ask to stop the interview or ask for counsel."). Instead, Tran explained that on the day of the murder, he was downtown with a friend giving out sandwiches to homeless people because he gives back to his community. Tran explained that he was a medical assistant student, and the "very reason why [he] chose to pursue this career was to help save lives, not take them." Tran steadfastly denied the murder despite what others said about him, and "that was [his] story." Thus, Tran participated in the interview without confusion or complication, evincing that he understood what Detective Duke was saying throughout the interview. *See Joseph*, 309 S.W.3d at 27.

Regarding coercion, Tran did not argue in his motion to suppress or at the motion to suppress hearing that his statements were coerced. "Global statements" in a written motion to suppress are not sufficient to preserve arguments for appeal. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005). A party waives error when (1) a suppression motion makes global arguments citing little more than constitutional and statutory provisions and (2) the party fails to argue any specific grounds for suppressing evidence at the suppression hearing. *Id.* (holding party waives error when suppression motion

20

makes global arguments citing little more than constitutional and statutory provisions and party fails to argue specific ground for suppressing evidence at suppression hearing); *see also Lugo v. State*, 299 S.W.3d 445, 450 (Tex. App.—Fort Worth 2009, pet. ref'd) ("[T]he complaint made on appeal must comport with the complaint made in the trial court or the error is forfeited."). Nonetheless, the record shows no evidence of intimidation or coercion. *See Hernandez*, 387 S.W.3d at 886. Detective Duke did not promise Tran anything, so there appears to be no possibility that a promise from police could have jeopardized the voluntariness of appellant's statement. *See Joseph*, 309 S.W.3d at 27.

We conclude Tran's conduct demonstrated that he had the requisite level of comprehension to waive his *Miranda* rights. *See id.* The totality of the circumstances surrounding the interrogation shows Tran's waiver was voluntary and resulted from a free and deliberate choice without intimidation, coercion, or deception. *See Leza*, 351 S.W.3d at 349. We overrule Tran's second issue in its entirety.

## IV. RECUSAL

By his third issue, Tran argues that the trial court abused its discretion when it denied his motion to recuse.

### A. Standard of Review & Applicable Law

"An appellate court reviews an order denying a motion to recuse under an abuse of discretion standard." *Abdygapparova v. State*, 243 S.W.3d 191, 197 (Tex. App.—San Antonio 2007, pet. ref'd). "[T]his standard requires a determination that the court acted without any guiding rules and principles, the trial court abuses its discretion only if the

ruling on the motion was not within the zone of reasonable disagreement." *Id.* at 197–98. "[I]n the absence of a clear showing to the contrary, an appellate court presumes the trial court was neutral and detached." *Id.* at 198.

The party filing a motion to recuse bears the burden of proving recusal is warranted and must satisfy a high threshold. *Drake v. Walker*, 529 S.W.3d 516, 528 (Tex. App.—Dallas 2017, no pet.); *see also In re B.W.C.*, No. 04-18-00473-CV, 2019 WL 360659, at *2 (Tex. App.—San Antonio Jan. 30, 2019, no pet.) (mem. op.). "A judge must recuse in any proceeding in which the judge's impartiality might reasonably be questioned[.]" TEX. R. CIV. P. 18b(b)(1). "The test for recusal is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt that the judge is actually impartial." *Drake*, 529 S.W.3d at 528 (internal quotation omitted). In challenging a judge's impartiality, "the [movant's] burden is met only through a showing of bias or impartiality to such an extent that the movant was deprived of a fair trial." *Id.*

## B.    Relevant Facts

On Friday, March 31, 2023, after the trial recessed for the day, Detective Duke approached the trial judge in chambers and advised the trial court that he may know one juror. On Monday, April 3, 2023, at the next trial court setting, the trial court informed the parties of this information on the record. Defense counsel questioned how Detective Duke knew one of the jurors. Detective Duke responded that he still does not know that he knows the juror, only that the juror looks familiar to him. Detective Duke stated that he

22

"felt like there was a good chance [he] might know" the juror, he "felt like [he] needed to say something, because [he's] not familiar with the protocol . . . so [he] thought the best thing to do was to let the judge know and go from there. And that's what [he] did." The trial court then stated it would question whether the juror recognized any of the witnesses.

Defense counsel then stated that it moved to recuse the trial court for "having an *ex parte* [communication with] an agent of the State," claiming it was "highly inappropriate for a judge" to have this communication with a witness without a lawyer present on each side. The trial court stated that no facts of the case were mentioned, there was no discussion of Detective Duke's testimony as a witness, the only discussion was about how or whether he knew the juror and how the trial court would proceed to determine the same. The trial court stated there was no *ex parte* communication because there was no discussion of the facts of the case or Detective Duke's role "and [they] merely [discussed the] procedure as to how we would proceed today."

The jury was then brought in, and the trial court asked whether any juror recognized any of the witnesses so far and to indicate so by raising the juror's hand. Because none of the jurors responded, the trial commenced.

Tran thereafter filed a motion to recuse, and a hearing was held before another judge sitting by assignment. Tran argued three things: (1) Detective Duke participated in *ex parte* communication with the trial court; (2) the trial court did not inform Tran of this meeting over the weekend and waited until Monday, creating "a tremendous appearance of impropriety"; and (3) there is still a juror who may know Detective Duke.

23

The sitting judge explained that the trial court had "nothing to do with a witness walking into her chambers and telling her something important that she should know" and did not see how "that is enough grounds to recuse the judge." The sitting judge denied the motion to recuse.

## C.      Discussion

The grounds for recusal Tran relied on in his motion to recuse were Rules 18(b)(1), (b)(2), and (b)(5) of the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 18(b)(1), (b)(2), (b)(5). Rule 18 provides that a judge must recuse if "the judge's impartiality might reasonably be questioned," *Id.* R. 18(b)(1), "the judge has a personal bias or prejudice" concerning a party, *id.* R. 18(b)(2), and "the judge participated as counsel, adviser, or material witness in the matter in controversy, or expressed an opinion concerning the merits of it, while acting as an attorney in government service." *Id.* R. 18(b)(5). Members of the judiciary are prohibited from engaging in *ex parte* communications between "the judge and a party, an attorney, a guardian or attorney ad litem, an alternative dispute resolution neutral, or any other court appointee concerning the merits of a pending or impending judicial proceeding." TEX. CODE JUD. CONDUCT, Canon 3(B)(8).

First, the trial court did not engage in an *ex parte* communication with a party, an attorney, or any other court appointee. *See id.*; *see also Abdygapparova*, 243 S.W.3d at 207 ("*Ex parte* communications involve 'fewer than all of the *parties* who are legally entitled to be present.'" (emphasis added) (quoting *In re Thoma*, 873 S.W.2d 477, 496 (Tex. Rev. Trib. 1994, no appeal))). Second, the trial court did not engage in

24

communications concerning the merits of pending litigation. *See* TEX. CODE JUD. CONDUCT, Canon 3(B)(8). Therefore, the trial court did not engage in prohibited communications.

Instead, Detective Duke informed the trial court about his possible familiarity with a juror, and the trial court informed him of the procedure that the trial court would take regarding this disclosure. *See id.*; *see also Ochoa v. Ochoa*, No. 11-15-00103-CV, 2017 WL 1957708, at *3 (Tex. App.—Eastland May 11, 2017, pet. denied) (mem. op.) ("[T]he specific facts of the case were not discussed in the e-mails. Therefore, the communications between Judge Hall and Riggan were not prohibited *ex parte* communications."). Thus, the record establishes that the communication between Detective Duke and the trial court involved an administrative matter rather than the merits of the case.[7] *See Abdygapparova*, 243 S.W.3d at 208–09 (finding judicial bias where the trial judge repeatedly sent "secretive" notes to the prosecutor "providing guidance to the prosecutor on the presentation of his case"); *see also Debord v. State*, No. 13-21-00280-CR, 2023 WL 8642236, at *24 (Tex. App.—Corpus Christi–Edinburg Dec. 14, 2023, pet. ref'd) (mem. op., not designated for publication) (finding that a substantive, rather than administrative, matter was a "single, misguided *ex parte* communication," but was "promptly disclosed to Devon's counsel," and did not demonstrate judicial bias).

---

[7] Tran agrees that the conversation regarded "Duke's personal familiarity with a juror, how any inquiry of the juror would take place, and how the case would proceed in the event the juror recognized" Detective Duke. Thus, Tran acknowledges the conversation did not involve the merits of the case.

Furthermore, the trial court apprised defense counsel of this matter at the next available court setting and promptly polled the jury about whether it was familiar with any of the witnesses thus far. Only after the jury affirmed it did not recognize any of the witnesses, did the trial court resume with trial. We conclude that Tran did not satisfy the "high threshold" demonstrating why the trial court must be recused, and we cannot say that Tran was deprived of a fair trial. *See Ex parte Ellis*, 275 S.W.3d 109, 116 (Tex. App.—Austin 2008, no pet.); *Drake*, 529 S.W.3d at 528. Accordingly, the presiding judge did not act without reference to any guiding rules or principles. *See In re State ex rel. Durden*, 587 S.W.3d at 80. We overrule Tran's third issue.

## V. MOTION FOR CONTINUANCE

Tran argues that the trial court erred by denying his motion for a continuance thereby preventing him from cross-examining Detective Duke and from conducting an independent investigation.

### A. Standard of Review

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). We examine the circumstances presented to the trial court. *Guerrero v. State*, 528 S.W.3d 796, 799 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). To establish an abuse of discretion, a defendant must show the denial of his motion actually prejudiced him. *Id.*; *see also Casillas v. State*, No. 04-19-00314-CR, 2020 WL 2441432, at *2 (Tex. App.—San Antonio May 13, 2020, no pet.) (mem. op., not designated for publication).

A motion for continuance must be in writing, set forth in full the sufficient cause for delay, and be sworn by someone having personal knowledge of the facts relied on for the request. TEX. CODE CRIM. PROC. ANN. arts. 29.03, 29.08.

## B.      Analysis

Tran requested a continuance on the grounds that he needed "time to receive and review undisclosed and relevant evidence" and moved for a continuance on the day of jury selection. The trial court held a hearing outside the presence of the jury.

At the hearing, Detective Duke testified that he began his investigation by looking at surveillance video, and, through Google searches, he narrowed the vehicle type to a Hyundai Genesis. Based on the appearance of the front grill, his Google search revealed that the model year was a 2012 or 2013. Detective Duke stated that he did not retain any records from these Google searches. He then searched the SAPD database for moving violations and police reports which included a 2012 or 2013 white Hyundai Genesis. This search yielded thirteen results—and the most suspicious was Espinar's moving violation for reckless driving in which Xanax and a shotgun were found in the car.[8] Detective Duke investigated his lead, and because his investigation led to evidence and a confession from Espinar, Detective Duke did not investigate the other twelve results.

Even assuming without deciding that the trial court erred by denying Tran's motion for continuance, Tran has not shown that the denial "actually and specifically prejudiced

---

[8] According to Detective Duke, SAPD now uses a different system, so he is unable to recreate his search as the new system would not deliver the same results.

[his] defense." *Guerrero*, 528 S.W.3d at 800. Instead, Tran asserts that he was missing "potentially exculpatory and impeaching documents" about how Detective Duke identified the suspect vehicle as belonging to Espinar. At the hearing, Tran stated that an independent investigation "might prove that one of those people was the shooter, but also it's [sic] impeachment for Detective Duke." On appeal, Tran states that he needed additional time: to conduct an independent investigation regarding the records Detective Duke failed to retain concerning the other twelve suspect vehicles; to recreate Detective Duke's search through an investigator; and to cross-examine Detective Duke in front of the jury.[9]

However, Tran "fails to support these assertions with any specific evidence." *Id.* "[M]ere speculation about evidence that a defendant might have developed if the continuance were granted is not sufficient to demonstrate harm." *Id.*; *see Renteria v. State*, 206 S.W.3d 689, 702 (Tex. Crim. App. 2006) ("Case-law requires more than this type of speculation to justify an appellate reversal of a case for a trial court's failure to grant a continuance."); *Nwosoucha v. State*, 325 S.W.3d 816, 825 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) ("Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance."). "There is no showing what testimony a continuance would have permitted [Tran] to discover and produce, or to further develop

---

[9] The record shows that Tran cross-examined Detective Duke regarding his methods in locating the suspect vehicle, whether he visited the dealership websites regarding changes in the models of their vehicles, whether he kept the police reports he used regarding the other twelve police reports, the fact that Detective Duke can no longer run the same search due to an upgraded system SAPD now uses, and that Detective Duke can no longer reproduce the same results from his previous search.

on cross-examination." *Guerrero*, 528 S.W.3d at 801. In other words, Tran "has failed to show what substantive difference the denial of the continuance made." *Id.*; *see also Casillas*, 2020 WL 2441432, at *3 ("If a motion for continuance is denied, the proper way to establish actual prejudice, and thus harm, is by presenting evidence at a motion for new trial hearing."). On this record and based on the circumstances presented to the trial court, we conclude that Tran has not shown he was harmed by the denial of his motion for continuance such that the trial court abused its discretion. *Guerrero*, 528 S.W.3d at 799. We overrule his fourth issue.

## VI. DETECTIVE DUKE'S TESTIMONY

Tran argues the trial court erred by allowing Detective Duke to testify as an expert in automobile characteristics because he lacked expertise in the field.

## A. Pertinent Facts

Detective Duke testified that he viewed surveillance video and was able to determine that the suspect vehicle was a Hyundai Genesis. According to Detective Duke, "there were multiple angles, some of it very, very good video . . . to determine that this was a Hyundai Genesis." Specifically, he mentioned "that you can see the wheels[,] . . . what the grill looked like," and he "was able to narrow that down to only two possible year models of Hyundai Genesis." Tran objected, which the trial court sustained. The following transpired:

> [State]: Detective Duke, how many cars have you seen in your lifetime?
>
> [Duke]: Thousands probably.

29

[State]:          Millions?

[Duke]:           Yeah.

[State]:          And are you generally familiar with cars?

[Duke]:           I mean, I would say average.

[State]:          Just yes or no?

[Duke]:           Yes.

[State]:          Okay. Are you familiar with different car brands?

[Duke]:           Yes.

[State]:          Can you identify different car brands?

[Duke]:           Yes.

[State]:          Have you ever used Google to look up a car?

[Duke]:           Yes.

[State]:          And is Google a sufficient means to research different types of cars based on your knowledge of how a car looks?

[Duke]:           Yes.

[State]:          And I didn't even ask this, but is that how you determined what kind of car this was in this case?

[Duke]:           Yes.

[Tran's Counsel]: Your Honor, I'd like to take him on voir dire. If they're going to prove him as an automotive expert.

[Court]:          I'm going to deny that. Go ahead.

30

| | |
|---|---|
| [State]: | Detective Duke, once you Googled this car and it[]s characteristics and you determined that it was a Hyundai Genesis, what did you do? |
| [Tran's Counsel]: | I object to leading in the first portion, and I also object that this is outside the scope of his expertise. |
| [Court]: | Overruled. |
| [Duke]: | Once I felt confident that this was a Hyundai Genesis, possibly year model 2012 or 2013, I went to SAPD's database—we have a couple. One that I searched was everybody that had received any kind of moving violation in a white Hyundai Genesis, year model 2012 or 2013. |

## B.    Standard of Review & Applicable Law

We review a trial court's ruling on the admissibility of opinion testimony from a lay witness or an expert for an abuse of discretion. *Gallo*, 239 S.W.3d at 765. The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

A lay witness can only give opinion or inferential testimony if it is (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. TEX. R. EVID. 701. "[O]bservations that do not require significant expertise to interpret and are not based on a scientific theory can be admitted as lay opinions if the requirements of Rule 701 are met." *Rhomer v. State*, 522 S.W.3d 13, 22 (Tex. App.—San Antonio 2017), *aff'd*, 569 S.W.3d 664 (Tex. Crim. App. 2019).

31

Additionally, even events not normally encountered by most people in everyday life do not necessarily require the testimony of an expert. The personal experience and knowledge of a lay witness may establish that he or she is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge.

*Id.* (quoting *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002)). Not all observations by witnesses with experience and training can be admitted as lay opinion testimony. *Id.* "It is only when the fact-finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert." *Id.* (quoting *Osbourn*, 92 S.W.3d at 537).

## C.      Analysis

In this case, Detective Duke did not offer testimony involving automobile characteristics. Instead, Detective Duke observed surveillance video of a vehicle depicting a Hyundai Genesis and used a Google search to find the specific model of the vehicle. Detective Duke did not offer any opinions based on any scientific theories, and his testimony was limited solely to what he observed. Tran does not explain how Detective Duke's "investigative technique" of using a Google search and his conclusion that the vehicle was a 2012 or 2013 Hyundai Genesis constitutes an expert opinion, nor does he reference any legal authority that supports this proposition. *See* TEX. R. APP. P. 38.1 (i).

In fact, Tran concedes that "[t]he testimony elicited from Detective Duke would match that of literally any person in the United States. Every person has seen thousands of cars in their lifetime. Every person has used Google image search." Therefore, there is no "specialized knowledge, training or experience . . . based on scientific principles"

32

that would render his testimony as that of an expert. *Rhomer*, 569 S.W.3d 664; *see also Menchaca v. State*, No. 04-22-00243-CR, 2023 WL 4338639, at *10 (Tex. App.—San Antonio July 5, 2023, no pet.) (mem. op., not designated for publication) ("A witness will not always qualify as an expert merely by virtue of a general background."). Accordingly, we conclude that Detective Duke did not testify as an expert, and his testimony was admissible as lay witness testimony under Rule 701. *See* TEX. R. EVID. 701(a) (allowing lay witness opinion testimony when "rationally based on the witness's perception"). We overrule his sixth issue.

## VII. IMPEACHING A WITNESS

By his seventh issue, Tran argues the trial court prevented him from impeaching Dolan as to bias in favor of the State.

"[G]enerally speaking, the Texas Rules of Evidence permit the defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition." *Jones v. State*, 571 S.W.3d 764, 769 (Tex. Crim. App. 2019) (quoting *Hammer v. State*, 296 S.W.3d 555, 563 (Tex. Crim. App. 2009)). "[A] defendant [should] be permitted to explore any plausible basis for witness bias, whether or not the witness is willing to admit to it." *Id.*

Here, Tran asked Dolan if he felt pressured by the State to give his testimony. Dolan responded, "Not really." Tran asked whether Dolan had a choice, and Dolan responded, "No."

33

| | |
|---|---|
| [Tran's Counsel]: | Did the prosecutors, while discussing your testimony with you, promise to do anything for you? |
| [Dolan]: | Just take care of my dog. |
| [Tran's Counsel]: | How long have you had the dog? |
| [Dolan]: | I've had the dog for about two weeks. |
| [Tran's Counsel]: | How important is he to you? |
| [Dolan]: | She's very important to me. |
| [Tran's Counsel]: | Do you share your food with your dog? |
| [Dolan]: | Yeah. |
| [Tran's Counsel]: | What's her name? |
| [Dolan]: | Her name is Scooby. |

The State then objected under relevance, which the trial court sustained.

Tran thereafter made an offer of proof. Tran stated that he was prohibited from asking "certain questions in front of the jury." He clarified that he was prevented from getting into the subject of whether Dolan "felt pressure to cooperate with the State in answering their questions." However, the record reflects that Tran asked Dolan just that question, which prompted Dolan to answer, "Not really." Additionally, Tran was able to question Dolan about being pressured to testify, whether he had a choice, and the State's promise to care for Dolan's dog while he testified—all in the presence of the jury. *See id.* at 669–670 ("Appellant should be able to ask her these questions in the jury's presence so that it could gauge the plausibility of her response."). We conclude that the trial court

34

did not prevent Tran from impeaching Dolan as to potential bias. We overrule Tran's seventh issue.

## VIII.   JURY INSTRUCTION

By his eighth issue, Tran argues that the trial court failed to include a jury instruction on the voluntariness of his custodial interrogation and that he suffered egregious harm as a result.

### A.    Standard of Review & Applicable Law

We review a claim of charge error through a two-step process: first determining whether jury charge error exists and then conducting a harm analysis if error is found to exist. *See Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021). Section 6 of Article 38.22 provides that where the question is raised as to the voluntariness of a statement from the accused, the court must determine, outside the presence of the jury, whether the statement was voluntarily made. *See* TEX. CODE CRIM. PROC. ANN. Art. 38.22 § 6. Upon a finding that the statement was voluntarily made, "evidence pertaining to such matter may be submitted to the jury, and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose." *Id.* If the question is raised and the parties litigate the issue, "then the defendant should request a general voluntariness jury instruction" as § 6 becomes the law applicable to the case. *Day v. State*, 696 S.W.3d 720, 736 (Tex. App.—San Antonio 2024, pet. ref'd). However, "[i]f no reasonable jury could find that the facts, disputed or undisputed, rendered [a defendant] unable to make a voluntary statement,

35

then a defendant is not entitled to an Article 38.22, section 6 voluntariness instruction." *Id.* (citing Estrada v. State, 313 S.W.3d 274, 300 (Tex. Crim. App. 2010)).

**B.     Discussion**

Here, Tran contested the voluntariness of his video-recorded statements at a motion to suppress hearing. However, there is no evidence that Tran's statements were involuntary, and nothing in the video suggests that Tran's custodial interrogation was involuntary. Furthermore, Tran does not direct us to any evidence in the record that demonstrates that his custodial interrogation statements were involuntary. Instead, on appeal, Tran generally asserts that he "did not knowingly, intelligently, and voluntarily waive his rights set out" in *Miranda*. Importantly, Tran does not inform this Court what evidence entitled him to such an instruction, and we find none. *See id.* In other words, a reasonable jury could have concluded, based on the evidence, that Tran's statements were voluntary. *See Martinez v. State*, 660 S.W.3d 179, 198 (Tex. App.—San Antonio 2022, pet. ref'd) ("Finally, Martinez was not entitled to an Article 38.22 § 6 voluntariness instruction because no reasonable jury could find that the facts, disputed or undisputed, rendered him unable to make a voluntary statement." (internal quotations omitted)). Because there was no evidence before the jury on the issue of voluntariness, the trial court was not required to give the jury a voluntariness instruction as § 6 did not become the "law applicable to the case." *See Oursbourn v. State*, 259 S.W.3d 159, 175 (Tex. Crim. App. 2008) ("[I]f such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction. It is only after the trial judge is notified of the

36

voluntariness issue (or raises it on his own) that a chain of other requirements comes into play, culminating in the defendant's right to a jury instruction."). We overrule Tran's eighth issue.[10]

### IX.    IMPROPER ARGUMENT

Lastly, Tran argues that the State engaged in improper argument throughout trial.

## A.    Standard of Review

"Proper jury argument falls generally within one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument made by opposing counsel; and (4) a plea for law enforcement." *Ford*, 444 S.W.3d at 198. "Error exists when an argument presents facts not supported by the record to the jury, but this error is not reversible unless, in light of the entire record, the argument is extreme or manifestly improper." *See id.* Counsel's remarks during final argument must be considered in the context in which they appear. *See Denison v. State*, 651 S.W.2d 754, 761 (Tex. Crim. App. 1983) (en banc).

## B.    Objections that were Sustained

Tran complains of the following statements made by the State:

(1)    [Salinas] wasn't innocent. [Salinas] was a drug dealer, but he didn't deserve to die like that. He didn't deserve to be gunned down behind a Wingstop where we all go to get our food.

---

[10] In any event, Tran did not request a jury instruction regarding voluntariness and must therefore show he suffered egregious harm, which is "a difficult standard to meet." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). In this regard, Tran does not inform this Court how he was egregiously harmed or cite to pertinent authority applying the egregious harm standard to the facts in his case. *See* TEX. R. APP. P. 38.1(i).

(2)     That's fair, but [defense counsel]'s making stuff up that's not anywhere in this. That's my objection.

(3)     So this would require—if you found this defense that he was justified in shooting, it would require you to find that [Tran] was justified. You have to find all these things are supported by the evidence beyond a reasonable doubt—that [Tran] was unlawfully dispossessed of property—

(4)     Y'all, we want you to decide what is immediately necessary in this situation? Go back there and tell us. Because if you think it's immediately necessary to shoot a kid in the back because he's running off with your money, fine. Fine. I don't want to live here in San Antonio, if that's what people think is okay.

(5)     [Espinar] didn't know that until this trial. We never talked about GPS coordinates on this phone.

Tran objected to these statements, and the trial court sustained these objections. The trial court then gave the jury an instruction to disregard upon Tran's request and denied his motion for a mistrial.

Here, the State's comments were immediately followed by an objection and an instruction to disregard. We must presume the jury complied with this instruction. *See Archie v. State,* 340 S.W.3d 734, 741 (Tex. Crim. App. 2011) ("The law generally presumes that instructions to disregard and other cautionary instructions will be duly obeyed by the jury."); *see also Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004) (providing that when the trial court sustains an objection to improper argument and grants a requested instruction to disregard, the only adverse ruling and thus the only proper issue for appeal is whether the trial court abused its discretion in denying a mistrial); *Saavedra v. State*, No. 04-16-00747-CR, 2017 WL 5615577, at *3 (Tex. App.—

38

San Antonio Nov. 22, 2017, no pet.) (mem. op., not designated for publication) ("When a trial court sustains an objection and gives the jury an instruction to disregard, but denies a motion for mistrial, an appellate court assumes, without deciding, that the argument was improper and only looks to whether the court abused its discretion when it denied the motion for mistrial." (internal citation omitted)). Generally, any harm from an improper jury argument will be cured by an instruction to disregard, and Tran does not argue on appeal that the trial court erred in denying his motions for a mistrial. *See Hawkins*, 135 S.W.3d at 84; *see also Turk v. State*, No. 04-02-00743-CR, 2004 WL 56920, at *1 (Tex. App.—San Antonio Jan. 14, 2004, no pet.) (mem. op., not designated for publication).

## C.     Objections at Trial do not Comport

At trial, Tran objected to the following statements based on "unsworn testimony": "Okay. So I want to merge this, because I want the jury to know the truth. You just said that you came home from waking up from a stupor, and [Tran] and you go back to your apartment and you didn't know what time it was that night?"; and "Now, Detective Duke starts asking you real specifics about the murder." Tran further objected to the following questions posed by the State to Espinar based on bolstering: (1) "Now, I guess you say that in an interesting way. You're here telling the jury that you want to accept responsibility. Why are you still lying at that point?"; (2) "What things do you know off the top of your head that you've stayed consistent with this entire time?"; (3) "So your story has never changed as to who was driving and who was in the passenger seat?"

On appeal, Tran argues that these statements are improper arguments. To

39

preserve such arguments for appellate review, a party must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired and obtain a ruling. TEX. R. APP. P. 33.1(a); *Navarro-DePaz v. State*, 689 S.W.3d 19, 24 (Tex. App.—San Antonio 2024, pet. ref'd); *Ford v. State*, 444 S.W.3d 171, 198 (Tex. App.—San Antonio 2014), *aff'd*, 477 S.W.3d 321 (Tex. Crim. App. 2015) ("[A] defendant's failure to object to a jury argument or failure to pursue an adverse ruling to an objection to a jury argument forfeits the defendant's right to complain about the argument on appeal."); *see also Romo v. State*, No. 04-03-00327-CR, 2004 WL 1251662, at *3 (Tex. App.—San Antonio June 9, 2004, no pet.) (mem. op., not designated for publication) ("An objection as to bolstering and an objection as to the prosecutor giving unsworn testimony are two distinct objections."). In the trial court, Tran did not object on the basis of improper argument. "In the absence of a trial objection that comports with a defendant's argument on appeal, the issue on appeal is waived." *Trejo v. State*, 683 S.W.3d 815, 821 (Tex. App.—San Antonio 2023, no pet.). Therefore, Tran did not preserve these complaints for our review.

## D.      Remaining Objections

Tran complains the State improperly shifted the burden of proof during its closing argument. After discussing Tran's defenses and the evidence presented at trial, the State made the following statement: "If you have more than one defense, you have no defense. They're throwing everything at the wall because they know what the truth is." The trial court overruled Tran's objection. Here, the State presented its theory of the case and

40

evidence linking Tran to the murder. The State refuted Tran's different defensive theories, including that Tran was giving sandwiches to homeless people at the time of the murder and that Tran's cell phone was hacked, which Tran claimed was the reason why incriminating evidence was found on it. Thus, it was reasonable for the State to deduce from the evidence and argue that Tran's multiples defenses were meritless. *See Denison*, 651 S.W.2d at 762. Accordingly, we conclude the State engaged in proper jury argument, and the trial court properly overruled Tran's objection. *See Ford*, 444 S.W.3d at 198.

Next, Tran argues that the State engaged in improper argument while discussing Dolan:

> Then if he's not showing up for court on Monday morning when we ask him to, or Tuesday morning when we ask him to, yes, we are going to go out and pick him up. And the only way to legally do it is to put him in cuffs and bring him here to testify. We did that for the family and we did that for justice and we did for the truth.

According to Tran, this inflamed the jury and attempted to elicit sympathy and bias. However, during Tran's closing argument, he stated that the State "drag[ged] him in here in chains and in orange, they jail[ed] him. They ma[d]e him come up here." It is proper jury argument for the State to "answer to argument made by opposing counsel," such as the argument that Tran made here. *Id.* Thus, the trial court properly overruled Tran's objection.

Tran also complains the following constitutes improper argument: "The investigation. Detective Duke, he's a great detective. Y'all can make whatever determination you want based on his credibility. But every single attack a defense

41

attorney ever does is on how much better a job they could have done." The State did not state its personal belief about Detective Duke's credibility or indicate that the jury should believe Detective Duke. *See Stout v. State*, 426 S.W.3d 214, 222 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("A prosecutor may not attempt to make that credibility determination for the jury."). Instead, the State informed the jury to make whatever determination it wanted based on Detective Duke's credibility. *See id.* (explaining that the State "may invite the jury to make its own credibility determination based on the evidence presented at trial."). Therefore, this does not constitute improper argument.

Lastly, Tran complains of the following:

> When you go back there—and Austin already told you this—we want you to find him guilty of capital murder. And we understand that is a hard decision to make. But if you find yourself saying, yes, he is guilty of capital murder, but you're not following the order, but I feel bad for him, but he's young . . . . Don't use bias, sympathy or prejudice. One of the things that really got to me when we were doing voir dire is a lot of people were crying and saying 'I could never send somebody away for that long,' and they were crying thinking about his consequences. Why don't you think about Andres Salinas' family?

According to Tran, the reference to the victim's family "is a plea for objectivity or for considerations of the expectations of the victim's family." We disagree. The State "did not ask the jurors to abandon their objectivity by placing themselves in the victim's shoes." *Ayala v. State*, 267 S.W.3d 428, 435 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). Furthermore, the State did not ask the jurors to render a verdict based on what the victim's family desired. *See id.* (finding that the State's remarks that the jury should think of justice for the victim's family was not improper). Instead, the State merely asked the jurors to

follow the law, even if doing so conflicted with their personal beliefs. We overrule Tran's last issue in its entirety.

## X. CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
20th day of March, 2025.